IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-03350-CMA-BNB

COLORADO CHRISTIAN UNIVERSITY,

    Plaintiff,

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, et al.,

    Defendants.

## DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT & MEMORANDUM IN SUPPORT THEREOF

Pursuant to Federal Rule of Civil Procedure 12(b)(1), defendants hereby move to dismiss the First Amended Complaint for lack of subject matter jurisdiction.

The Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010),[1] and implementing regulations, require all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain recommended preventive services without cost-sharing (such as a copayment, coinsurance, or a deductible).[2] As relevant here, except as to group health plans of certain religious employers (and health insurance coverage sold in connection with those plans), the preventive services that must be covered include all Food and Drug Administration ("FDA")-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider. Plaintiff Colorado

---

[1] Amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).
[2] A grandfathered plan is one that was in existence on March 23, 2010 and that has not undergone any of a defined set of changes. *See e.g.,* 45 C.F.R. § 147.140.

Christian University filed suit, seeking to have the Court invalidate and enjoin the preventive services coverage regulations. Plaintiff alleges that its sincerely held religious beliefs prohibit it from providing coverage for emergency contraceptives.

Since plaintiff filed this action, defendants finalized an amendment to the preventive services coverage regulations, issued guidance on a temporary enforcement safe harbor, and initiated a rulemaking to further amend the regulations, all designed to address religious concerns such as those raised by plaintiff. The finalized amendment confirms that group health plans sponsored by certain religious employers (and any associated group health insurance coverage) are exempt from the contraception coverage requirement. The enforcement safe harbor encompasses a larger group of non-profit organizations with religious objections to providing contraceptive coverage; it provides that, during the safe harbor period, which will be in effect until the first plan year that begins on or after August 1, 2013, defendants will not bring any enforcement action against organizations that meet certain criteria (and associated plans and issuers). Finally, defendants published an advance notice of proposed rulemaking ("ANPRM") in the Federal Register that confirms defendants' intent, before the expiration of the safe harbor period, to propose and finalize additional amendments to the preventive services coverage regulations to further accommodate non-exempt, non-grandfathered religious organizations' religious objections to covering contraceptive services. The ANPRM suggests ideas and solicits public comment on potential accommodations, including, but not limited to, requiring health insurance issuers to offer health insurance coverage without contraceptive coverage to religious organizations that object to such coverage and simultaneously to offer contraceptive coverage directly to such organizations' plan participants, at no charge.

In light of these actions, this Court lacks authority to adjudicate plaintiff's claims. Plaintiff's suit must be dismissed for lack of jurisdiction because plaintiff has not alleged an imminent injury from the operation of the regulations and plaintiff's claims are not ripe. The allegations in the amended complaint do not establish that plaintiff does not qualify for the temporary enforcement safe harbor. Therefore, plaintiff will not be subject to any enforcement action by defendants for failure to cover emergency contraceptives until August 2013, at the earliest. By that time, defendants will have finalized amendments to the challenged regulations to accommodate the religious objections of religious organizations like plaintiff.

## **BACKGROUND**

**I.   STATUTORY BACKGROUND**

Prior to the enactment of the ACA, many Americans did not receive the preventive health care they needed to stay healthy, avoid or delay the onset of disease, lead productive lives, and reduce health care costs. Due in large part to cost, Americans used preventive services at about half the recommended rate. *See* INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19-20, 109 (2011) ("IOM REP."). Section 1001 of the ACA – which includes the preventive services coverage provision that is relevant here – seeks to cure this problem by making recommended preventive care affordable and accessible for many more Americans.

The preventive services coverage provision requires all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage to provide coverage for certain preventive services without cost-sharing.[3] 42

---

[3] A group health plan includes a plan established or maintained by an employer that provides medical care to employees. 42 U.S.C. § 300gg-91(a)(1). The ACA does not require employers to provide health coverage for their employees, but, beginning in 2014, certain large employers may face assessable payments if they fail to do so under certain circumstances. 26 U.S.C. § 4980H.

U.S.C. § 300gg-13. The preventive services that must be covered include, for women, such additional preventive care and screenings not separately recommended by the United States Preventive Services Task Force as provided in comprehensive guidelines supported by the Health Resources and Services Administration ("HRSA"), an agency within the Department of Health and Human Services ("HHS"). *Id.*

Research shows that cost-sharing requirements can pose barriers to preventive care and result in reduced use of preventive services, particularly for women. IOM REP. at 109. Indeed, a 2010 survey showed that less than half of women are up to date with recommended preventive care screenings and services. *Id.* at 19. By requiring coverage for recommended preventive services and eliminating cost-sharing requirements, Congress sought to increase access to and utilization of recommended preventive services. 75 Fed. Reg. 41726, 41728 (July 19, 2010). Increased use of preventive services will benefit the health of individual Americans and society at large. 75 Fed. Reg. at 41733. Individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease; healthier workers will be more productive with fewer sick days; and increased utilization will result in savings due to lower health care costs. *Id.*; IOM REP. at 20.

Defendants issued interim final regulations on July 19, 2010 that provide, among other things, that a group health plan or health insurance issuer offering non-grandfathered health coverage must provide coverage for newly recommended

---

Institutions of higher education are not required by federal law to provide, or to contract with health insurance issuers to provide, health insurance to their students. If students receive health insurance through a health insurance issuer, then the obligation to provide coverage for recommended preventive services rests on the issuer, not the institution of higher education. *See e.g.*, 45 C.F.R. § 147.130(a). If students receive health coverage directly through an institution of higher education, and not through a health insurance issuer, then there is no obligation to provide coverage for recommended preventive services under federal law. *See* 77 Fed. Reg. 16453, 16455 (Mar. 21, 2012).

preventive services, without cost-sharing, for plan years that begin on or after the date that is one year after the date on which the new recommendation is issued. 75 Fed. Reg. 41726. Because there were no existing HRSA guidelines relating to preventive care for women, HHS tasked the Institute of Medicine ("IOM") with "reviewing what preventive services are necessary for women's health and well-being" and developing recommendations for comprehensive guidelines. IOM REP. at 2. IOM conducted an extensive science-based review and, on July 19, 2011, published a report of its analysis and recommendations. *Id.* at 20-26. The report recommended that HRSA guidelines include, among other things, "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a health care provider. *Id.* at 10-12.

On August 1, 2011, HRSA adopted IOM's recommendations in full, subject to an exemption relating to certain religious employers authorized by an amendment to the interim final regulations. *See* HRSA Guidelines, *available at* http://www.hrsa.gov/womensguidelines/. The amendment, issued on the same day, authorized HRSA to exempt group health plans sponsored by certain religious employers (and associated group health insurance coverage) from any requirement to cover contraceptive services under HRSA's guidelines. 76 Fed. Reg. 46621 (Aug. 3, 2011). To qualify for the exemption, an employer must meet all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

    (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B).[4] Thus, as relevant here, the amended interim final regulations required non-grandfathered plans that do not qualify for the religious employer exemption to provide coverage for recommended contraceptive services, without cost-sharing, for plan years beginning on or after August 1, 2012.

After considering the more than 200,000 comments they received on the amended interim final regulations, defendants decided to adopt in final regulations the definition of religious employer contained in the amended interim final regulations while also creating a temporary enforcement safe harbor for plans sponsored by certain non-profit organizations with religious objections to contraceptive coverage that do not qualify for the religious employer exemption. 77 Fed. Reg. 8725-27 (Feb. 15, 2012).

Pursuant to the temporary enforcement safe harbor, defendants will not take any enforcement action against an employer, group health plan, or group health insurance issuer with respect to a non-exempt, non-grandfathered group health plan that fails to cover any recommended contraceptive service and that is sponsored by an organization that meets all of the following criteria:

    (1) The organization is organized and operates as a non-profit entity.

    (2) From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan sponsored by the organization, consistent with any applicable state law, because of the religious beliefs of the organization.

    (3) The group health plan sponsored by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) provides to plan participants a prescribed notice indicating that

---

[4] Sections 6033(a)(1), (a)(3)(A)(i), and (a)(3)(A)(iii) of the Internal Revenue Code refer to "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," that are exempt from taxation under 26 U.S.C. § 501(a).

6

>> the plan will not provide contraceptive coverage for the first plan year beginning on or after August 1, 2012.
>
> (4) The organization self-certifies that it satisfies the three criteria above, and documents its self-certification in accordance with prescribed procedures.[5]

The safe harbor also applies to any institution of higher education and the issuer of its student health insurance plan if the institution and its student plan satisfy the criteria above. 77 Fed. Reg. at 16456-57. The safe harbor will be in effect until the first plan year that begins on or after August 1, 2013. Guidance at 3. By that time, defendants expect significant amendments to the preventive services coverage regulations will have altered the landscape with respect to religious accommodations under the regulations by providing further relief to organizations like plaintiff.

Defendants began the process of amending the regulations on March 21, 2012 by publishing an ANPRM in the Federal Register. 77 Fed. Reg. 16501. The ANPRM "presents questions and ideas" on potential alternative means of achieving the goals of providing women access to contraceptive services without cost-sharing and accommodating religious organizations' liberty interests. *Id.* at 16503. The purpose of the ANPRM is to provide "an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made" in the forthcoming amendments. *Id.* Among other options, the ANPRM suggests requiring health insurance issuers to offer health insurance coverage without contraceptive coverage to religious organizations that object to such coverage on religious grounds and simultaneously to offer contraceptive coverage directly to the organization's plan participants, at no charge. *Id.* at 16505. The ANPRM also suggests ideas and solicits comments on potential ways to accommodate religious organizations

---

[5] HHS, Guidance on the Temporary Enforcement Safe Harbor ("Guidance"), at 3 (Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf.

that sponsor self-insured group health plans for their employees and religious organizations that are non-profit institutions of higher education that arrange health insurance plans for their students. *Id.* at 16505, 16506-07. After receiving comments on the ANPRM, defendants will publish a notice of proposed rulemaking, which will be subject to further public comment before defendants issue amendments to the preventive services coverage regulations. *Id.* at 16501. Defendants intend to finalize the amendments such that they are effective by the end of the temporary enforcement safe harbor. *Id.* at 16503.

## II.     CURRENT PROCEEDINGS

Plaintiff brought this action to challenge the lawfulness of the preventive services coverage regulations to the extent that they require the health coverage it makes available to its employees and students to cover emergency contraception (such as Plan B and Ella) and related patient education and counseling. Plaintiff filed suit before defendants created the enforcement safe harbor and before defendants initiated a rulemaking to further amend the regulations.[6]

Plaintiff describes itself as a "Christian liberal arts university" in Lakewood, Colorado, with approximately 4,200 students and 280 full-time employees. Amend. Compl. ¶¶ 12, 25, 26, ECF No. 26. According to the amended complaint, plaintiff currently makes available to its employees and students health plans that do not cover certain forms of contraception. *Id.* ¶¶ 27, 31-36, 42. Plaintiff alleges that it believes emergency contraceptives prevent a fertilized egg from implanting in the wall of the uterus thereby causing what plaintiff believes is an abortion. *Id.* ¶¶ 92-93. Plaintiff

---

[6] After defendants moved to dismiss the complaint for lack of jurisdiction, plaintiff filed an amended complaint. Because the allegations in the amended complaint still fail to establish jurisdiction, defendants again move for dismissal. *See* Minute Order, *Belmont Abbey College v. Sebelius*, No. 11-cv-01989-JEB (Mar. 20, 2012) (dismissing defendants' motion to dismiss without prejudice as moot after plaintiff amended its complaint in a similar case).

further asserts that its sincerely held religious beliefs prohibit it from providing coverage or access to coverage for emergency contraceptives and related education and counseling. *Id.* ¶ 127. Plaintiff claims the preventive services coverage regulations violate the First Amendment to the U.S. Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

## ARGUMENT

The party invoking federal jurisdiction bears the burden of proof. *Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998). Where, as here, defendants challenge jurisdiction on the face of the complaint, the complaint must plead sufficient facts to establish that jurisdiction exists. *See id.*

### I. THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF DOES NOT HAVE STANDING

To establish standing, a plaintiff must demonstrate that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A plaintiff that "alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*

Plaintiff has not alleged an injury in fact because the allegations in the amended complaint do not establish that plaintiff does not qualify for the enforcement safe harbor. Under the enforcement safe harbor, defendants will not take any enforcement action

further asserts that its sincerely held religious beliefs prohibit it from providing coverage or access to coverage for emergency contraceptives and related education and counseling. *Id.* ¶ 127. Plaintiff claims the preventive services coverage regulations violate the First Amendment to the U.S. Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

## ARGUMENT

The party invoking federal jurisdiction bears the burden of proof. *Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998). Where, as here, defendants challenge jurisdiction on the face of the complaint, the complaint must plead sufficient facts to establish that jurisdiction exists. *See id.*

### I. THE COURT LACKS JURISDICTION BECAUSE PLAINTIFF DOES NOT HAVE STANDING

To establish standing, a plaintiff must demonstrate that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A plaintiff that "alleges only an injury at some indefinite future time" has not shown an injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*

Plaintiff has not alleged an injury in fact because the allegations in the amended complaint do not establish that plaintiff does not qualify for the enforcement safe harbor. Under the enforcement safe harbor, defendants will not take any enforcement action

against an organization that qualifies for the safe harbor until the first plan year that begins on or after August 1, 2013. Guidance at 3. Plaintiff does not allege that it will not satisfy the safe harbor criteria with respect to its student health insurance plan. Moreover, although plaintiff asserts that its employee group health plan is not eligible for the safe harbor, Amend. Compl. ¶ 124, the only fact plaintiff alleges to support this legal conclusion – that plaintiff's employee plan "provide[s] coverage for contraceptive drugs other than Plan B and Ella," *id.* – does not establish that plaintiff does not qualify for the safe harbor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009); *Young v. Wachovia Mortg. Co.*, No. 11-cv-01963-CMA, 2011 WL 6934110, at *2 (D. Colo. Dec. 30, 2011) (observing that a court considering a motion to dismiss is "not bound to accept as true a legal conclusion couched as a factual allegation" or "naked assertion[s] devoid of further factual enhancement"). Rather, defendants have made clear that an organization is not disqualified from the protection of the safe harbor with respect to its plan's failure to cover those contraceptive services to which it objects on religious grounds merely because its plan covers other contraceptive services. 77 Fed. Reg. at 16504.

There is, therefore, nothing in the amended complaint to demonstrate that plaintiff will be unable to meet the criteria for the enforcement safe harbor with respect to both its employee group health plan and its student health insurance plan. Because plaintiff alleges its plan years begin on July 1 and mid-August, Amend. Compl. ¶¶ 43-44, the earliest plaintiff (or the issuer(s) of its employee and student health plans) could be subject to any enforcement action by defendants for failing to cover emergency contraceptives is mid-August 2013. With such a long time before the inception of any possible injury and the challenged regulations undergoing amendment before then, plaintiff cannot satisfy the imminence requirement for standing; the asserted injury is

simply "too remote temporally." *See McConnell v. FEC*, 540 U.S. 93, 226 (2003), *overruled in part on other grounds*, *Citizens United v. FEC*, 130 S. Ct. 876 (2010).

This defect in plaintiff's suit does not implicate a mere technical issue of counting intermediate days; rather, it goes to the fundamental limitations on the role of federal courts. The "underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in 'a case in which no injury would have occurred at all.'" *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2). This concern is particularly appropriate here. Defendants have published an ANPRM in the Federal Register that confirms, and seeks comment on, defendants' intention to propose amendments to the challenged regulations that would accommodate the concerns of religious organizations that object to providing contraceptive coverage for religious reasons, like plaintiff. 77 Fed. Reg. at 16501. The ANPRM provides plaintiff, and any other interested party, with the opportunity to comment on ideas suggested by defendants for accommodating religious organizations, offer new ideas to "enable religious organizations to avoid . . . objectionable cooperation when it comes to the funding of contraceptive coverage," and identify factors defendants should take into account when amending the regulations. *Id.* at 16503, 16507. Defendants, moreover, have indicated that they intend to finalize the amendments before the rolling expiration of the temporary enforcement safe harbor starting on August 1, 2013. *Id.* at 16503; *see also* 77 Fed. Reg. at 8728. In light of the forthcoming amendments, and the opportunities plaintiff will have to help shape those amendments, there is no reason to believe that plaintiff will be required to sponsor a health plan that covers contraceptive services in contravention of its religious beliefs once the safe harbor expires. At the very least, given the anticipated changes to the challenged regulations, plaintiff's claim of injury, if any, after the temporary enforcement

11

safe harbor expires would differ substantially from plaintiff's current claim of injury. And, given the existing enforcement safe harbor, there is no basis for this Court to consider the merits of plaintiff's amended complaint at this juncture.

Accordingly, this case should be dismissed for lack of standing.

## II.     THE COURT LACKS JURISDICTION BECAUSE THIS CASE IS NOT RIPE

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003). It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08. A case ripe for judicial review cannot be "nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952). In assessing ripeness, courts evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The Supreme Court discussed these two prongs in *Abbott Laboratories*, the seminal case on pre-enforcement review of agency action. *Abbott Laboratories* involved a pre-enforcement challenge to regulations that required drug manufacturers to include a drug's established name every time the drug's proprietary name appeared on a label. 387 U.S. at 138. The regulations required the plaintiff drug manufacturers to change all their labels and advertisements at considerable burden and expense. *Id.* at 152. Noncompliance would have triggered significant penalties. *Id.* at 153 & n.19.

The Court determined the regulations were fit for judicial review because they were "quite clearly definitive," *id.* at 151; the regulations "were made effective immediately upon publication," *id.* at 152, and "[t]here [was] no hint that th[e] regulation[s] [were] informal . . . or tentative." *Id.* at 151. Moreover, the Court noted that "the issue tendered [was] a purely legal one" and there was no indication that "further administrative proceedings [were] contemplated." *Id.* at 149. The Court therefore was not concerned that judicial intervention would inappropriately interfere with further administrative action. With respect to the hardship prong, the Court determined that delayed review would cause sufficient hardship to the plaintiffs. The impact of the regulations, the Court noted, was "sufficiently direct and immediate" because their promulgation put the drug manufacturers in a "dilemma" – "[e]ither they must comply with the every time requirement and incur the costs of changing over their promotional material and labeling" or "risk serious criminal and civil penalties for the unlawful distribution of misbranded drugs." *Id.* at 152–53.

None of the indicia of ripeness discussed in *Abbott Laboratories* is present here. Defendants have initiated a rulemaking to amend the challenged regulations to accommodate the concerns expressed by plaintiff and have made clear that the amendments will be finalized before the earliest date on which the challenged regulations could be enforced by defendants against plaintiff. 77 Fed. Reg. at 8728-29. Therefore, unlike in *Abbott Laboratories* – where the challenged regulations were definitive and no further administrative proceedings were contemplated – the preventive services coverage regulations will be amended.

Moreover, the forthcoming amendments are intended to address the very issue that plaintiff raises here by establishing alternative means of providing contraceptive coverage without cost-sharing while accommodating religious organizations' religious

13

objections to covering contraceptive services. And plaintiff will have several opportunities to participate in the rulemaking process and to provide comments and/or ideas regarding the proposed accommodations. There is, therefore, a significant chance that the amendments will alleviate altogether the need for judicial review, or at least narrow and refine the scope of any actual controversy to more manageable proportions. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe . . . if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). Once the forthcoming amendments are finalized, if plaintiff continues to believe it is injured, plaintiff "will have ample opportunity [] to bring its legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998); *see also Texas Indep. Producers and Royalty Owners Assoc. v. EPA*, 413 F.3d 479, 483-84 (5th Cir. 2005) (dismissing challenge to rule as unripe where agency deferred effective date of rule and announced intent to consider issues raised by plaintiff in new rulemaking during deferral period); *Lake Pilots Assoc., Inc. v. U.S. Coast Guard*, 257 F. Supp. 2d 148, 160-162 (D.D.C. 2003) (holding challenge to rule was not ripe where agency undertook new rulemaking to address issue raised by plaintiff).

Further, although plaintiff's amended complaint raises largely legal claims, those claims are leveled at regulations that, as applied to plaintiff and similarly-situated organizations, have not "taken on fixed and final shape," *Public Serv.*, 344 U.S. at 244, and are not "presented in clean-cut and concrete form," *Keyes v. Sch. Dist. No. 1*, 119 F.3d 1437, 1443 (10th Cir. 1997). Once defendants complete the rulemaking outlined in the ANPRM, plaintiff's challenge to the current regulations likely will be moot. And judicial review now of any anticipated future amendments to the regulations that will result from the pending rulemaking would be too speculative to yield meaningful review;

it would only entangle the Court "in abstract disagreements over administrative policies." *Abbott Labs.*, 387 U.S. at 148; *Motor Vehicle Mfrs. Assoc. v. New York State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1306 (2d Cir. 1996) (concluding claims were not ripe where "plaintiffs' arguments depend upon the effects of regulatory choices to be made by [state] in the future"). Because judicial review at this time would inappropriately interfere with defendants' pending rulemaking and may result in the Court deciding issues that may never arise, this case is not fit for judicial review.

Withholding or delaying judicial review also would not result in any hardship for plaintiff. Unlike the plaintiffs in *Abbott Laboratories*, plaintiff here is not being compelled to make immediate and significant changes in its day-to-day operations under threat of serious civil and criminal penalties. As explained above, there is no reason to believe that plaintiff will not qualify for the enforcement safe harbor, meaning defendants will not take any enforcement action against plaintiff for failure to cover emergency contraceptives until August 2013, at the earliest. And, by the time the safe harbor expires, defendants will have finalized amendments to the challenged regulations to accommodate religious objections to providing contraceptive coverage, like plaintiff's. Therefore, this is simply not a case where plaintiff is "forced to choose between foregoing lawful activity and risking substantial legal sanctions." *See Abbott Labs.*, 387 U.S. at 153. Accordingly, the case should be dismissed as unripe.

For all of these reasons, the Court should grant defendants' motion to dismiss.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General               /s/ Michelle R. Bennett
IAN HEATH GERSHENGORN                           MICHELLE R. BENNETT
Deputy Assistant Attorney General               Trial Attorney (CO Bar 37050)
JOHN F. WALSH, U.S. Attorney                    U.S. Department of Justice
JENNIFER RICKETTS, Director                     20 Mass. Ave. NW
SHEILA M. LIEBER, Deputy Director               Washington, DC  20530

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on April 9, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

erassbach@becketfund.org

ebaxter@becketfund.org

and I hereby certify that I have mailed or served the document or paper to the following non- CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by nonparticipant's name:

None.

 s/ Michelle R. Bennett
MICHELLE R. BENNETT
Trial Attorney