**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 11-cv-03350-CMA-BNB

COLORADO CHRISTIAN UNIVERSITY,

      Plaintiff,

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and
Human Services,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
HILDA SOLIS, Secretary of the United States Department of Labor,
UNITED STATES DEPARTMENT OF LABOR,
TIMOTHY GEITHNER, Secretary of the United States Department of the Treasury, and
UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

---

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS FOR LACK OF JURISDICTION**

---

      In this religious freedom action for declaratory and injunctive relief, Plaintiff

Colorado Christian University ("Colorado Christian" or "CCU") asserts that Defendants

have violated its rights under the Religious Freedom Restoration Act ("RFRA"), the First

Amendment of the United States Constitution, and the Administrative Procedure Act by

issuing certain regulations pursuant to the Patient Protection and Affordable Care Act

("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010).  This matter is before the

Court on Defendants' Federal Rule of Civil Procedure 12(b)(1) Motion to Dismiss.  (Doc.

# 31.)  For the reasons discussed below, Defendants' motion is granted.

# I.  BACKGROUND

## A.    RELEVANT STATUTES AND REGULATIONS

The legal challenge in this case revolves around the ACA requirement that group

health plans provide no-cost coverage for "preventative care and screenings" for

women.  42 U.S.C. § 300gg-13(a)(4).[1]  The Health Resources and Services Admini-

stration ("HRSA") was tasked with developing guidelines for such "preventative care and

screenings."  *Id.*  The HRSA adopted guidelines that require insurance plans to cover,

among other things, all "contraceptive methods," including the emergency

contraceptives levonorgestrel (also known as "Plan B" or the "morning-after pill") and

ulipristal (also known as "Ella" or the "week-after pill"), "sterilization procedures, and

patient education and counseling for all women with reproductive capacity" that

are approved by the Food and Drug Administration.  *See* http://www.hrsa.gov/

womensguidelines.  On August 1, 2011, Defendants the United States Department of

Health and Human Services ("HHS"), the United States Department of Labor ("Labor"),

and the United States Department of the Treasury ("Treasury") promulgated an interim

final rule, effective August 1, 2011, requiring "group health plan[s] and . . . health

insurance issuer[s] offering group or individual insurance coverage [to] provide benefits

for and prohibit the imposition of cost-sharing with respect to" the preventive services for

---

[1]   The preventative care coverage mandate does not apply to grandfathered health
plans – *i.e.*, plans existing on or before March 23, 2010.  *See* Interim Final Rules for
Group Health Plans and Health Insurance Coverage Relating to Status as a Grand-
fathered Health Plan Under the Patient Protection and Affordable Care Act, 75 Fed. Reg.
34538, 34540 (June 17, 2010).  However, CCU asserts, Defendants do not dispute, and
the Court agrees that CCU does not maintain such a health plan.  (*See* Doc. # 26 at 8.)

women included in the HRSA's guidelines.  76 Fed. Reg. 46621; *see also* 45 C.F.R. § 147.130.

The interim final rule was amended, however, to "provide HRSA additional discretion to exempt certain religious employers from the [HRSA] Guidelines where contraceptive services are concerned."  76 Fed. Reg. 46621, 46263; *see also* 45 C.F.R. § 147.130(a)(1)(iv)(A).  The HRSA developed such an exemption to include, effectively, houses of worship but not other religious organizations like CCU.[2]

Defendants received over 200,000 comments in response to the amended interim final rule.  Many of the comments asserted that the religious employer exemption was overly narrow and that its limited scope could impinge religious freedoms.  *See* Group Health Plan and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8727 (Feb. 15, 2012).  After considering these comments, Defendants finalized the amendment to the interim final rule without making any changes to the criteria used to determine whether an organization qualifies for the religious employer exemption.  *Id.* at

---

[2]  To qualify for the religious employer exemption under the interim final rule, an organization must satisfy all of the following criteria:

The inculcation of religious values is the purpose of the organization.
(1) The organization primarily employs persons who share the religious tenets of the organization.
(2) The organization serves primarily persons who share the religious tenets of the organization.
(3) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B) (HHS); *see also* 26 C.F.R. § 54.9815-2713T (Treasury); 29 C.F.R. § 2590.715-2713(a)(1)(iv) (Labor).

8730 ("the amendment to the interim final rule . . . is adopted as a final rule without change"). However, they also created a one-year enforcement "safe harbor" for "certain non-exempted, non-profit organizations with religious objections to covering contraceptive services." *Id.* at 8728. Defendants have agreed that, during the safe harbor, which will remain in effect until at least August 1, 2013, they will not take any enforcement action against an employer or group health plan that complies with the conditions of the safe harbor. *See* HHS, Guidance on Temporary Enforcement Safe Harbor, at 3 (Aug. 15, 2012), *available at* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf. To comply with the safe harbor, organizations must:

> (1) be organized and operate as a non-profit entity;
> (2) have refrained from providing contraceptive coverage from February 10, 2012, onward "because of the religious beliefs of the organization";
> (3) provide notice to participants stating that "contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012"; and
> (4) self-certify that they satisfy the first three criteria.

HHS, Guidance on Temporary Enforcement Safe Harbor, at 3 (Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf.[3]

---

[3] In a revised guidance, Defendants clarified:

> (1) that the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . . ;
> (2) that group health plans which took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . . ; and (3) that the safe harbor may be invoked without prejudice by non-profit organizations that are uncertain whether they qualify for the religious employer exemption . . . .

HHS, Guidance on Temporary Enforcement Safe Harbor, at 1 n.1 (Aug. 15, 2012), *available at* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf.

When Defendants issued the amended interim final rule in February 2012, they stated that "[b]efore the end of the temporary enforcement safe harbor," they would "work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage." 77 Fed. Reg. 8725, 8728. Consistent with this plan, on March 21, 2012, Defendants filed an advance notice of proposed rulemaking ("ANPRM") in the Federal Register, which formally declared their intention to further amend the interim final rule after soliciting input from interested parties and the public. The ANPRM "presents questions and ideas" about how to "accommodat[e] non-exempt, non-profit religious organizations' religious objections to covering contraceptive services," while "assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing."[4] 77 Fed. Reg. 16501, 16503. Defendants state that the ANPRM "is the first step toward promulgating these amended final regulations. Following the receipt of public comment, a notice of proposed rulemaking (NPRM) will be published, which will permit additional public comment, followed by amended final regulations." *Id.*

---

[4] One potential accommodation Defendants have proposed is to require health insurance issuers to provide insurance coverage that excludes contraceptive services to objecting religious organizations while simultaneously offering contraceptive coverage directly to plan participants without charging either the participants or the organization. 77 Fed. Reg. 16501, 16505.

**B.      COLORADO CHRISTIAN UNIVERSITY**

Colorado Christian University is a Christian liberal arts university located in Lakewood, Colorado, which is "committed to offering a complete education that develops students intellectually, professionally, and spiritually." (Doc. # 26 at 4.) As such, education at CCU centers on the Christian faith. (*Id.*) The university "describes itself as a 'Christ-centered community' and commits, in its mission, to 'exemplary academics, spiritual formation, and engagement with the world.'" (*Id.* at 5.) All CCU employees profess the same Statement of Faith, "which establishes the essential framework within which members of the University both unite in shared beliefs and explore differences." (*Id.*)

Colorado Christian's beliefs include traditional Christian teachings on the sanctity of life, including that "each human being bears the image and likeness of God, and therefore that all human life is sacred and precious, from the moment of conception." (*Id.* at 5–6.) Thus, CCU teaches and believes that "abortion ends a human life and, with rare exceptions, is a sin." (*Id.* at 6.) Accordingly, CCU asserts that deliberately providing insurance coverage for, or deliberately providing insurance that would facilitate access to, abortion-inducing drugs, abortion procedures, and related services would violate its deeply held religious beliefs, regardless of whether the insurance was paid for by CCU or an insurer.[5] (*Id.*) Colorado Christian "has no conscientious

---

[5]   After the instant motion was fully briefed, CCU informed the Court that it recently switched to, and now maintains, self-funded healthcare plans which are managed by a third-party administrator. (*See* Doc. # 40-1 at 2.)

6

objection to providing coverage for non-abortion-inducing contraceptive drugs and devices." (*Id.*)

## C.   PROCEDURAL HISTORY

Colorado Christian initiated this action on December 22, 2011, against the three Departments responsible for the contraceptive-services regulation – HHS, Labor, and Treasury – and their respective Secretaries.  (Doc. # 1.)  After CCU filed suit, Defendants finalized the amendment to the interim final rule, created the one-year enforcement safe harbor, and declared their intention to amend, again, the interim final rule to accommodate non-profit religious organizations with religious objections to contraceptive coverage.  Defendants then moved the Court to dismiss the case for lack of jurisdiction, asserting that CCU did not have standing and that the case was not ripe. (Doc. # 22.)

Before CCU responded, Defendants filed the ANPRM, effectively formalizing their previously stated plan to further amend the interim final rule.  Thereafter, CCU responded to Defendants' motion to dismiss and also filed an Amended Complaint (Doc. # 26), the latter of which mooted Defendants' motion (*see* Doc. # 35).  On April 9, 2012, Defendants renewed their motion, again asking the Court to dismiss the case for lack of jurisdiction.[6]  (Doc. # 31.)

---

[6]   Colorado Christian responded to the motion on May 3, 2012 (Doc. # 34), to which Defendants replied on May 18, 2012 (Doc. # 36).

## II.  STANDARD OF REVIEW

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may take the form of either a facial attack on the complaint's allegations relating to jurisdiction or a challenge to the veracity of the alleged jurisdictional facts.  *See Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995).  A facial attack on the complaint's allegations regarding subject matter jurisdiction questions the legal sufficiency of the complaint. *See Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009).  In a factual challenge, on the other hand, the defendant "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Holt*, 46 F.3d at 1003.

The instant motion challenges jurisdiction only on the face of CCU's amended complaint.  (*See* Doc. # 31 at 9.)  The Court accepts CCU's factual allegations as true, *see Smith*, 561 at 1097, and determines merely whether they are facially sufficient to plausibly establish jurisdiction, *see Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks and citations omitted)).  *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  As the party invoking federal jurisdiction, CCU bears the burden of establishing that such jurisdiction exists. *See Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998).

### III. <u>DISCUSSION</u>

As with their initial motion to dismiss, Defendants base their renewed motion on standing and ripeness grounds.  (*See* Doc. # 31.)  Article III, Section 1 of the United States Constitution confers upon federal courts "[t]he judicial Power of the United States," and Article III, Section 2 provides that this power extends to certain categories of "Cases" and "Controversies."  As such, "a live case or controversy is a constitutional prerequisite to federal jurisdiction."  *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997).  This prerequisite imposes both standing and ripeness requirements. *See Clinton v. City of New York*, 524 U.S. 417, 429–30 & n.15 (1998); *Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1173 (10th Cir. 2011).  Although these requirements often overlap, they require "distinct inquiries: 'Whereas ripeness is concerned with when an action may be brought, standing focuses on who may bring a ripe action.'"  *Indiana Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (emphasis deleted) (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).  Because ripeness "provides a slightly more narrow ground for dismissal than standing," the Court will address Defendants' ripeness challenge first.  *See Zubik*, 2012 WL 5932977, at *7 n.12.

Before doing so, however, the Court notes that nine other federal district courts, and one federal appellate court, have already addressed the jurisdictional arguments Defendants raise here.  *See Univ. of Notre Dame v. Sebelius*, No. 3:12-cv-0523 (N.D. Ind. Dec. 31, 2012); *Catholic Diocese of Biloxi v. Sebelius*, No. 1:12-cv-00158 (S.D.

9

Miss. Dec. 20, 2012); *Wheaton Coll. v. Sebelius*, No. 12-5273 (D.C. Cir. Dec. 18, 2012);

*Roman Catholic Archdiocese of New York v. Sebelius*, --- F. Supp. 2d ----, 2012 WL

6042864 (E.D.N.Y. Dec. 4, 2012); *Most Reverent David A. Zubik v. Sebelius*, No. 2:12-

cv-00676, 2012 WL 5932977 (W.D. Pa. Nov. 27, 2012) (unpublished); *Catholic Diocese*

*of Nashville v. Sebelius*, No. 3-12-0934, 2012 WL 5879796 (M.D. Tenn. Nov. 21, 2012)

(unpublished); *Legatus v. Sebelius*, --- F. Supp. 2d ----, 2012 WL 5359630 (E.D. Mich.

Oct. 31, 2012); *Wheaton Coll. v. Sebelius*, --- F. Supp. 2d ----, 2012 WL 3637162

(D.D.C. Aug. 24, 2012), *Belmont Abbey Coll. v. Sebelius*, --- F. Supp. 2d ----, 2012 WL

2914417 (D.D.C. July 18, 2012); *Nebraska v. U.S. Dep't of Health & Human Servs.*, ---

F. Supp. 2d ----, 2012 WL 2913402 (D. Neb. July 17, 2012).

Eight of the nine district courts decided that they lacked jurisdiction over the non-

profit religious organizations before them.  With the exception of the courts in the *Biloxi*

and *Legatus* cases, they did so based on both standing and ripeness grounds.[7]  At the

district level, only the *Roman Catholic Archdiocese of New York* court determined that

it had jurisdiction to proceed over certain nonprofit religiously affiliated plaintiffs.  *See*

2012 WL 6042864, at *23.  On December 18, 2012, the D.C. Circuit Court of Appeals, in

a two-page summary order, disagreed with the *Wheaton* and *Belmont Abbey* district

courts' rulings with respect to the issue of standing.  *Wheaton Coll.*, No. 12-5273, at

1–2.  Yet, it did not reverse and remand either case.  Rather, although it determined that

---

[7]   The *Biloxi* court decided solely the ripeness question, and the court in *Legatus* addressed only standing.

neither of the cases before it were fit for review, the court held the cases in abeyance and retained jurisdiction over them.  *Id.* at 2–3.

## A.   RIPENESS

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993).  The doctrine's basic rationale is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1997).  When assessing ripeness, the Court "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149.

Defendants argue that CCU's challenge is not ripe because the ANPRM began the process of further amending the interim final rule and, in the meantime, CCU is protected from enforcement by the temporary safe harbor.  (Doc. # 31 at 2–3.)

1.   Fitness of the Issues

In general, for a challenge to an administrative regulation to be fit for judicial review, the challenge must be to a "final agency action."  *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093–94 (10th Cir. 2004).  An administrative

regulation is final "when it is definitive rather than tentative, when it has a direct and immediate effect on the day-to-day business of the parties, and when it has the status of law and requires immediate compliance." *Colorado Envtl. Coal. v. Lujan*, 803 F. Supp. 364, 369 (D. Colo. 1992) (citing *Abbott Labs.*, 387 U.S. at 151–52). The finality of an administrative action is "interpreted pragmatically." *Sierra Club v. Yeutter*, 911 F.2d 1405, 1417 (10th Cir. 1990) (citing *Abbott Labs.*, 387 U.S. at 149).

In the instant case, Defendants have not only committed to further amend the interim final rule but, in fact, have initiated a rulemaking process to do so. Interpreted in a pragmatic way, Defendants' actions render tentative, as opposed to final, the regulation at issue and Defendants' position on the issues raised by CCU. *See, e.g.*, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998) (noting that a claim is unripe when "the possibility that further consideration will actually occur before [the agency's decision] is implemented is not theoretical, but real"). Had Defendants failed to take affirmative steps to follow through with their commitment, the Court may well have sided with CCU on the issue of ripeness. But by issuing the ANPRM and beginning the rulemaking process, Defendants have moved beyond the theoretical in considering how to accommodate organizations like CCU. They have also substan-tiated the good-faith presumption applicable to their consistent statements that the interim final rule will be further amended and will not be enforced in its current form against organizations like CCU. *See Belmont Abbey Coll.*, 2012 WL 2914417, at *9 (collecting cases in support of the proposition that agencies are presumed to act in good

12

faith absent compelling evidence to the contrary and observing that, with regard to the interim final rule, "[t]he government . . . has done nothing to suggest that it might abandon its efforts to modify the rule – indeed, it has steadily pursued that course – and it is entitled to a presumption that it acts in good faith").

Further, as against CCU, the amended interim final rule does not directly and immediately affect its day-to-day business or require immediate compliance, because CCU is protected by the temporary enforcement safe harbor.  In its amended complaint, CCU alleges that its "employee insurance plans . . . are not eligible for the Safe Harbor, because they provide coverage for contraceptive drugs other than Plan B and Ella." (Doc. # 26 at 20.)  However, the regulations indicate that CCU's provision of other contraceptive drugs does not preclude application of the safe harbor.[8]  77 Fed. Reg. 16501, 16504 (indicating that organizations which cover some contraceptives may qualify for the safe harbor).  As such, CCU is not currently required to comply with the rule on a day-to-day basis.

Although some of the courts which have recently considered the issues presented here have found that application of the safe harbor does not preclude the exercise of subject matter jurisdiction, they have done so in the context of addressing their respective plaintiff's standing.  *See Roman Catholic Archdiocese of New York*,

---

[8]   Moreover, after amending its complaint, CCU indicated that, based on Defendants' August 15, 2012 revised guidance (*see* fn.3, *supra*), "the safe harbor [extends] to organizations like CCU that covered some objectionable contraceptive services after February 10, 2012 . . . ."  (Doc. # 52 at 1.)  Although unnecessary for the Court's determination, this eventuality supports the conclusion that, in fact, CCU is protected by the safe harbor.

2012 WL 6042864, at *13; *Belmont Abbey Coll.*, 2012 WL 2914417, at *8–9.  As far

as the ripeness inquiry is concerned, however, the temporary safe harbor provides

meaningful protection to CCU.  It does not merely delay the inevitable but, rather,

provides Defendants with the time they need to amend the interim final rule in a way

that might alleviate the harm CCU complains of and, as such, obviate the need for

judicial review.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not

ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." (internal quotation marks and citation

omitted)); *Wheaton Coll.*, No. 12-5273, at 2 (concluding that cases involving other

nonprofit religious organizations "are not fit for review at this time because if we do not

decide the merits of [their] challenge to the current rule now, we may never need to"

(quotation marks, citation, and alterations omitted)).

Colorado Christian objects to this line of reasoning asserting, essentially, that no

amendment crafted by Defendants could adequately address its grievances.  (*See* Doc.

# 34 at 12.)  To be sure, a distinct possibility exists that CCU will end up litigating its

claims against Defendants.  Colorado Christian's amended complaint came on the heels

of, and was responsive to, Defendants' ANPRM, which suggested – as an

accommodation to CCU's concerns – a proposal for requiring health insurance issuers

to provide insurance coverage that excludes contraceptive services to objecting

religious organizations while simultaneously offering contraceptive coverage directly to

plan participants without charging either the participants or the organization.  77 Fed.

14

Reg. 16501, 16505.  Had such a proposal been finalized as an amendment to the

interim final rule, CCU's claims would, by all appearances, now be ripe.  But the fact

remains that Defendants' proposal was just that – a proposed solution subject to

comment and alteration.  On this point, even the *Roman Catholic Archdiocese of*

*New York* court rejected as speculative the argument that "any possible accommo-

dation . . . provide[d] pursuant to the ANPRM will be inadequate," reasoning that "it is

uncertain what form" the forthcoming amendment will take.  2012 WL 6042864, at *15

n.9.  *See also Univ. of Notre Dame*, No. 3:12-cv-0523, at 8 ("Taking defendants at their

word concerning the intended reworking of the rule, this regulatory requirement won't

require [plaintiff] to conduct itself in ways [its religious] mission forbids.  This regulation's

replacement might do so, but no one can say because that future rule hasn't been

promulgated.").  As stated previously, the ANPRM "presents questions and ideas"

about how best to accommodate nonprofit organizations with religious objections to

contraceptive coverage.  77 Fed. Reg. 16501, 16503.  If CCU is unsatisfied with the

amendment, after it takes shape and is finalized, CCU may file suit again.  *See Sierra*

*Club*, 523 U.S. at 734 (finding claim unripe where plaintiff will have "opportunity later

to bring its legal challenge at a time when harm is more imminent and more certain").

In the meantime, however, the Court declines CCU's implicit invitation to issue an

advisory opinion on the potential solutions Defendants might propose as it proceeds

to further amend the interim final rule.  *See Laird v. Tatum*, 408 U.S. 1, 14 (1972)

("the federal courts established pursuant to Article III of the Constitution do not render advisory opinions" (quotation marks and citation omitted)).

The Court reaches this conclusion notwithstanding Colorado Christian's argument that "Defendants cannot reasonably dispute that the new "Final Rule" is truly **final** for purposes of ripeness." (Doc. # 34 at 10–11 (emphasis in original).)  Colorado Christian bases this argument on its assertion that "[o]n February 10, 2012, following an interim final rule, an amended interim final rule, and extensive public comments, Defendants issued a final regulation emphasizing that the [preventative care coverage] Mandate was being 'adopted as a final rule without change.'" (*Id.* at 10 (quoting 77 Fed. Reg. 8725, 8730).)  The flaw in CCU's reasoning is that Defendants did not finalize the preventative care coverage mandate at that time or at any other time since then.[9] Instead, as the Federal Regulation CCU cites makes clear, Defendants only finalized the religious employer exemption as an amendment to the interim final rule.  *See* 77 Fed. Reg. 8725, 8730 ("the amendment to the interim final rule . . . is adopted as a final rule without change").  To illustrate the finality of an agency's action by simply emphasizing the word "final," as CCU does here, elevates form over substance and fails to account for the considerations outlined above.  *See, e.g.*, *Colorado Envtl. Coal.*, 803 F. Supp. at 369 (listing criteria used for determining whether an administrative regulation is final).  The Court agrees with Defendants that doing so also "ignores the

---

[9]   This same flaw exists in the *Roman Catholic Archdiocese of New York* order, which cites the regulation relied on by CCU to support its assertion that "[t]he Coverage Mandate is a final rule."  2012 WL 6042864, at *16.

reality of the regulatory landscape" in which they operate.  (*See* Doc. # 75 at 7.)

Therefore, the Court is unpersuaded by CCU's characterization of the current

rulemaking process as entailing "the possibility of unforeseen amendments."  (Doc. # 34

at 8 (quotation marks and citation omitted).)  Indeed, the process of further amending

the interim final rule has already begun and, until it is complete, the Court cannot rule on

CCU's claims.

Colorado Christian's argument – that its "challenge to the Mandate raises

questions of law independent of any context specific facts" (Doc. # 34 at 11) – does not

persuade the Court to reach another conclusion.  To begin with, the Court questions

CCU's assertion in light of the discovery which has occurred in this case at CCU's

request.  Also, despite Defendants' agreement that CCU's claims "are largely legal"

(Doc. # 36 at 7), determining the merits of CCU's claims would still require the Court

to make findings of fact, *see, e.g.*, *United States v. Wilgus*, 638 F.3d 1274, 1284 (10th

Cir. 2011) (noting that, although "both prongs of RFRA's strict scrutiny test are legal

questions," findings on constitutional and "basic historical" facts "may be embedded in

a district court's . . . conclusion" (quotation marks and citations omitted)).  Further, the

Court cannot make any findings until the pending amendment to the interim final rule

is completed.  Until then, the Court's review could encompass, at most, the current

amended interim final rule, which would be highly inefficient since it will be altered

again soon.  For this reason, the Court agrees with the *Zubik* court's conclusion that

"a declaratory judgment would be of remarkably little utility at this stage."  2012 WL

5932977, at *9.  *See also Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952) (to be ripe, a disagreement between parties "must have taken on fixed and final shape so that a court can see what legal issues it is deciding"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("The interest in postponing review is powerful when the agency position is tentative.  Judicial review at that stage improperly intrudes into the agency's decisionmaking process . . . and squanders judicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind." (citations omitted)).  In any event, even if the Court were to agree with CCU's assertion that the issues presented here are simply "questions of law independent of any context specific facts," the Court still could not opine on whether the challenged regulations meet constitutional muster, because "[i]t is not the role of federal courts to resolve abstract issues of law."  *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1376 (10th Cir. 2011).  Absent a final amendment against which the Court would judge CCU's claims, the legal issues in this case remain too abstract to resolve.

The Court does not read the D.C. Circuit Court of Appeals' recent decision as leading to a contrary determination.  Indeed, that court held the cases before it were "not fit for review at this time."  *Wheaton Coll.*, No. 12-5273, at 2.  The court based its reasoning on Defendants' representations to the court that they: (1) will never enforce the current amended interim final rule against non-profit religious organizations (like CCU); (2) will develop a new rule for such organizations; and (3) will finalize the new rule before August 2013.  *Id.*  Defendants have made those same, or at least sufficiently

18

similar, representations in the instant case.  (*See* Doc. # 75 at 2–3 & n.3 (referencing the "government's clear, repeated, and ongoing statements that the challenged regulations will never be enforced by defendants against the [non-profit religious organization] plaintiffs in their current form"); Doc. # 31 at 15 (explaining that Defendants are working to "finalize[] amendments to the challenged regulations to accommodate religious objections to providing contraceptive coverage"); *id.* at 3 (by "August 2013 . . . defendants will have finalized amendments to the challenged regulations to accommodate the religious objections of religious organizations like plaintiff").)

Thus, the Court reaches the same conclusion as the D.C. Circuit Court of Appeals – and the overwhelming majority of the district courts that have ruled on this issue – *i.e.*, the case currently pending is not fit for review at this time.  Although the D.C. Circuit held the cases before it in abeyance, as opposed to dismissing them, it offered no compelling reason for doing so, nor is any such reason apparent to the Court.  Thus, the Court declines to exercise its discretion to hold this case in abeyance and, instead, adheres to the customary practice of dismissing an unripe case in its entirety.  *Cf.* 15 James WM. Moore et al., <u>Moore's Federal Practice</u> § 108.81 (3d ed. 2011) ("if a necessary component of jurisdiction, such as ripeness, is found to be lacking, the court has no choice but to dismiss the action").

2.      Hardship to the Parties

Colorado Christian next asserts that "even if fitness were in question, the

hardships CCU faces from delay weigh decisively in favor of immediate judicial review."

(Doc. # 34 at 14.)  The Court disagrees.

First, the Court concurs with Defendants that CCU's present planning for future

eventualities "do[es] not demonstrate a 'direct and immediate' effect on plaintiff's 'day-

to-day business' with 'serious penalties attached to noncompliance,' as required to

establish hardship."  (Doc. # 36 at 9 (quoting *Abbott Labs.*, 387 U.S. at 152–53).)

As previously mentioned, the temporary safe harbor currently protects CCU from

enforcement actions by Defendants.  Moreover, CCU's planning stems from its ongoing

speculation that Defendants will fail to amend the interim final rule in a satisfactory

manner.  However, such speculation, regardless of the costs it entails, is insufficient to

constitute a hardship that would outweigh the Court's determination on the fitness of the

issues presented[10] – especially because Defendants' stated intent is to amend the

interim final rule so as to accommodate the concerns CCU raises here.  *See Wilmac*

*Corp. v. Bowen*, 811 F.2d 809, 813 (3d Cir. 1987) ("Mere economic uncertainty affecting

the plaintiff's planning is not sufficient to support premature review."); *Tennessee Gas*

*Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) ("planning insecurity"

insufficient to establish hardship); *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162

---

[10]   Colorado Christian fails to convince the Court that any remedy the Court could offer would ameliorate its planning insecurities, as the content of the forthcoming amendment to the interim final rule can, at this point in time, only be guessed at.

(7th Cir. 1976) ("claims of uncertainty in [plaintiff's] business and capital planning are not sufficient to warrant our review of an ongoing administrative process").

Second, the Court is unpersuaded by CCU's argument that it is suffering a current hardship because it may be subjected to "third-party enforcement actions." (Doc. # 34 at 14.)  Although CCU is correct that the ACA "creates avenues by which private parties may seek to enforce the Mandate, regardless of Defendants' safe harbor" (*id.*), CCU does not allege that any third-parties have brought enforcement actions against it or that the regulatory landscape is such that a credible threat of prosecution by a third party currently exists.  Thus, this hardship is, at present, purely theoretical and would potentially affect CCU only if the issues it raises were to become fit for review.  *See Salvation Army v. Dep't of Cmty. Affairs of New Jersey*, 919 F.2d 183, 193 (3d Cir. 1990) (stating that "the theoretical possibility of a suit against [plaintiff] by a program beneficiary" is insufficient to establish jurisdiction).  Even the D.C. Circuit in its recent order acknowledged that exposure to liability from "claims brought by employees and other beneficiaries" was insufficient to alter the court's opinion that the cases before it should be held in abeyance because the issues they presented were not fit for review.  *Wheaton Coll.*, No. 12-5273, at 2–3.  Finally, the Court agrees with Defendants that "if a third-party were to sue [CCU] in the future for failure to provide contraception coverage, [CCU] would be able to raise all the claims it asserts here as a defense to that action."  (Doc. # 36 at 10 (citing 42 U.S.C. § 2000bb-1(c)).)

**B.      STANDING**

Defendants also assert that CCU lacks standing to bring this case.  Because the

Court has found that CCU's dispute is not ripe for review, the Court declines to address

Defendants' standing arguments.  *See Sierra Club*, 523 U.S. at 732; *Utah v. U.S. Dep't*

*of the Interior*, 210 F.3d 1193, 1196 & n.2 (10th Cir. 2000); *Biloxi*, No. 1:12-cv-00158, at

12 ("Because . . . the Court finds that this case is not ripe for adjudication, it need not

resolve the question of Plaintiffs' standing at this time.  Even if Plaintiffs possessed

standing to maintain this suit, the Court would nevertheless lack subject matter

jurisdiction because this matter is not ripe for review.").

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Rule 12(b)(1) Motion

to Dismiss (Doc. # 31) is GRANTED.  It is

FURTHER ORDERED that CCU's Motion to Compel Discovery Responses (Doc.

# 63) and the parties' Joint Motion for Extension of Case Management Deadlines (Doc.

# 78) are DENIED AS MOOT.  Finally, it is

FURTHER ORDERED that this case is DISMISSED WITHOUT PREJUDICE,

in its entirety, for lack of jurisdiction.

DATED:  January ___07___, 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge